# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF IOWA
### EASTERN DIVISION

JAIME E. HALL,

              Plaintiff,

vs.

COMMISSIONER OF SOCIAL
SECURITY,

              Defendant.

No. 18-CV-2032-LTS-KEM

**REPORT AND RECOMMENDATION**

---

Plaintiff Jaime E. Hall seeks judicial review of a final decision of the Commissioner of Social Security (the Commissioner) denying her application for disability insurance (DI) benefits under Title II of the Social Security Act, 42 U.S.C. §§ 401-434. Hall argues that the administrative law judge (ALJ), Raymond L. Souza, erred by failing to evaluate whether her impairments met or equaled Listings 11.02 and 14.09D, by discounting her treating physician's residual functional capacity (RFC) opinion without giving a good reason, and by failing to resolve an "apparent conflict" between the testimony of the vocational expert (VE) and the Dictionary of Occupational Titles (DOT). Hall also raises (for the first time) an Appointments Clause challenge in reliance on *Lucia v. SEC*, 138 S. Ct. 2044 (2018). I recommend **affirming** the Commissioner's decision.

## I.    BACKGROUND[1]

Hall filed an application for DI benefits on August 25, 2014, alleging disability since May 27, 2013. AR 61-62.[2] The Social Security Administration denied Hall's DI

---

[1] For a more thorough overview, see the Joint Statement of Facts (Doc. 12).

[2] "AR" refers to the administrative record below, filed at Docs. 9-2 to 9-10.

application initially in January 2015 and on reconsideration in April 2015. AR 60-93.

Hall requested review by an ALJ, and the ALJ held a video hearing on March 7, 2017. AR 31-32. Hall and VE Susan Johnson testified at the hearing. AR 31. On April 19, 2017, the ALJ issued a written decision following the familiar five-step process outlined in the regulations[3] to determine Hall was not disabled from May 27, 2013, to March 31, 2017, the date last insured. AR 13-23. The ALJ determined that Hall suffered from the following severe impairments: migraines, fibromyalgia, complex regional pain syndrome/reflex sympathetic dystrophy, cerebral microvascular disease, diabetes, degenerative joint disease of the right shoulder, degenerative disc disease of the spine, gout, depression, anxiety, carpal tunnel syndrome, and obesity. AR 15. At step three, the ALJ determined that Hall "did not have an impairment or combination of impairments that met or medically equaled the severity of" a listed impairment, specifically citing Listings 1.04, 12.04, and 12.06. AR 16-17. To determine Hall's ability to perform past work (at step four) and other work (at step five), the ALJ determined Hall's RFC[4]:

> [Hall] ha[s] the [RFC] to perform sedentary work . . . except that she is limited to no climbing of ladders, ropes, or scaffolds; occasional climbing of ramps or stairs; occasional stooping, crouching, kneeling, and crawling; occasional overhead reaching with the right upper extremity; frequent handling (i.e. gross manipulation) and frequent fine manipulation or fingering bilaterally; limited to jobs that can be performed while using an

---

[3] "The five-part test is whether the claimant is (1) currently employed and (2) severely impaired; (3) whether the impairment is or approximates a listed impairment; (4) whether the claimant can perform past relevant work; and if not, (5) whether the claimant can perform any other kind of work." **King v. Astrue**, 564 F.3d 978, 979 n.2 (8th Cir. 2009); *see also* **20 C.F.R. § 404.1520(a)(4)**. The burden of persuasion always lies with the claimant to prove disability, but during the fifth step, the burden of production shifts to the Commissioner to demonstrate "that the claimant retains the RFC to do other kinds of work[] and . . . that other work exists." **Goff v. Barnhart**, 421 F.3d 785, 790 (8th Cir. 2005) (quoting **Eichelberger v. Barnhart**, 390 F.3d 584, 591 (8th Cir. 2004)).

[4] RFC is "'what the claimant can still do' despite his or her physical or mental limitations." **Lewis v. Barnhart**, 353 F.3d 642, 646 (8th Cir. 2003) (quoting **Bradshaw v. Heckler**, 810 F.2d 786, 790 (8th Cir. 1987)).

2

assistive device for uneven terrain or prolonged ambulation only; must avoid all use of hazardous machinery (i.e. unshielded moving machinery) as well as all exposure to unprotected heights; able to remember, understand, and carry out simple, routine instructions and tasks consistent with [specific vocational preparation (SVP)] levels 1 or 2 type jobs with no strict production requirements and the emphasis being on a per shift rather than a per hour basis, for example, an employer would require so many widgets per day rather than per hour.

AR 17.[5]  In making this determination, the ALJ considered Hall's testimony, the treatment notes, Hall's activities of daily living, and the medical opinions.  AR 17-21. The ALJ assigned "only partial weight" to the medical opinion of Hall's primary care provider, Daniel Glascock, MD, finding the extreme limitations found by Dr. Glascock were not "fully support[ed]" by "[t]he evidence of record."  AR 21, 1149-1152.

Based on his determination of Hall's RFC, the ALJ concluded that Hall could not perform her past work.  AR 21.  The ALJ found that other work existed in significant numbers in the national economy that Hall could perform, however.  AR 22.  The ALJ relied on the VE's testimony that a hypothetical individual with Hall's age, education, work experience, and RFC could work as an addresser, eyeglass frames polisher, and surveillance systems monitor, and that respectively, 7,800, 1,800, and 4,541 of those positions existed in the national economy.  AR 22, 54-56.  Thus, the ALJ concluded that Hall was not disabled.  AR 22.

On March 12, 2018, the Appeals Council denied Hall's request for review (AR 1-3), making the ALJ's decision the final decision of the Commissioner.  *See* **20 C.F.R. § 404.981**.  Hall filed a timely complaint in this court, seeking judicial review of the Commissioner's decision (Docs. 1, 3).  *See* **20 C.F.R. § 422.210(c)**.  The parties briefed the issues (Docs. 13, 16, 17), and the Honorable Leonard T. Strand, Chief United States

---

[5] Occasionally is a term of art meaning "very little up to one-third" (or two hours) of an eight-hour workday.  *See, e.g.*, **Social Security Ruling (SSR) 96-9p,** 61 Fed. Reg. 34478, 34480 (July 2, 1996).  Frequently means one-third to two-thirds (or six hours) of an eight-hour day. *See, e.g.*, **SSR 83-10**, 1983-1991 Soc. Sec. Rep. 24, at 29-30 (CCH Jan. 1, 1983).

3

District Judge for the Northern District of Iowa, referred this case to me for a Report and Recommendation.

## II.    DISCUSSION

A court must affirm the ALJ's decision if it "is supported by substantial evidence in the record as a whole." *Kirby v. Astrue*, 500 F.3d 705, 707 (8th Cir. 2007); *see also* **42 U.S.C. § 405(g)**. "Substantial evidence is less than a preponderance, but enough that a reasonable mind might accept it as adequate to support a decision." *Kirby*, 500 F.3d at 707. The court "do[es] not reweigh the evidence or review the factual record de novo." *Naber v. Shalala*, 22 F.3d 186, 188 (8th Cir. 1994). If, after reviewing the evidence, "it is possible to draw two inconsistent positions from the evidence and one of those positions represents the [ALJ's] findings, [the court] must affirm the decision." *Robinson v. Sullivan*, 956 F.2d 836, 838 (8th Cir. 1992).

Hall argues that the ALJ erred at several steps of the sequential process: at step three, by failing to specifically analyze the applicability of Listings 11.02 and 14.09D; in determining RFC, by failing to incorporate all the limitations found by Dr. Glascock in his treating-source opinion; and at step five, by failing to resolve an apparent conflict between the VE's testimony and the DOT. Hall also argues that the ALJ's appointment to that position violates the Appointments Clause of the United States Constitution.

### A.  Listings 11.02 and 14.09D

During the third step of the disability determination, the ALJ considers whether the claimant's impairment or combination of impairments meets or equals one of the listings of presumptively disabling impairments set forth at 20 C.F.R. part 404, subpart P, appendix 1. **20 C.F.R. § 404.1520(a)(4)(iii)**. "[A claimant's] impairment[] meets the requirements of a listing when it satisfies all of the criteria of that listing, including any relevant criteria in the introduction, and meets the duration requirement." **20 C.F.R.**

4

**§ 404.1525(c)(3)** (citation omitted). A claimant can equal the listings in one of three ways:

> (1)(i) If [the claimant] ha[s] an impairment that is described in [the listings], but—
>> (A) [The claimant] do[es] not exhibit one or more of the findings specified in the particular listing, or
>> (B) [The claimant] exhibit[s] all of the findings, but one or more of the findings is not as severe as specified in the particular listing,
>
> (ii) [The Social Security Administration] will find that [the claimant's] impairment is medically equivalent to that listing if [the claimant] ha[s] other findings related to [the] impairment that are at least of equal medical significance to the required criteria.
>
> (2) If [the claimant] ha[s] an impairment(s) that is not described in [the listings], [the Social Security Administration] will compare [the claimant's] findings with those for closely analogous listed impairments. If the findings related to [the claimant's] impairment(s) are at least of equal medical significance to those of a listed impairment, [the Social Security Administration] will find that [the claimant's] impairment(s) is medically equivalent to the analogous listing.
>
> (3) If [the claimant] ha[s] a combination of impairments, no one of which meets a listing, [the Social Security Administration] will compare [the claimant's] findings with those for closely analogous listed impairments. If the findings related to [the claimant's] impairments are at least of equal medical significance to those of a listed impairment, [the Social Security Administration] will find that [the claimant's] combination of impairments is medically equivalent to that listing.

**20 C.F.R. § 404.1526(b)**. "To prove that an impairment or combination of impairments equals a listing, a claimant 'must present medical findings equal in severity to *all* the criteria for the one most similar listed impairment.'" ***KKC ex rel. Stoner v. Colvin***, 818 F.3d 364, 370 (8th Cir. 2016) (quoting ***Sullivan v. Zebley***, 493 U.S. 521, 531 (1990)); *see also* **20 C.F.R. § 404.1526(a)**.

Here, the ALJ concluded at step three that Hall's impairments did not meet or equal the severity of any listing. AR 16. The ALJ noted he "specifically considered" Listing 1.04, Listing 12.04, and Listing 12.06. AR 16. Hall argues that because the

5

ALJ found she suffers from fibromyalgia and migraines, the ALJ erred by failing to specifically analyze Listing 14.09D and Listing 11.02.[6]

The Commissioner responds that any error was harmless. "Although it is preferable that ALJs address a specific listing," the Eighth Circuit has consistently held that "failure to do so is not reversible error if the record supports the overall conclusion." *Pepper ex rel. Gardner v. Barnhart*, 342 F.3d 853, 855 (8th Cir. 2003); *accord Vance v. Berryhill*, 860 F.3d 1114, 1118 (8th Cir. 2017); *Scott ex rel. Scott v. Astrue*, 529 F.3d 818, 822-23 (8th Cir. 2008); *Karlix v. Barnhart*, 457 F.3d 742, 746-47 (8th Cir. 2006). "[R]emand is appropriate [only] where the ALJ's factual findings, considered in light of the record as a whole, are insufficient to permit [a court] to conclude that substantial evidence supports the Commissioner's decision." *Scott*, 529 F.3d at 822-23 (holding that remand was required when the record contained factual inconsistencies that the ALJ failed to resolve). Thus, even if the ALJ erred in failing to address Listing 14.09D or Listing 11.02, remand is not required if the record shows Hall's impairments did not meet or equal those Listings.

### 1. Listing 14.09D

Social Security Ruling (SSR) 12-2p provides guidance on how to evaluate fibromyalgia at step three:

> [Fibromyalgia] cannot meet a listing . . . because [it] is not a listed impairment. At step 3, therefore, [the Social Security Administration] determine[s] whether [fibromyalgia] medically equals a listing (for example, listing 14.09D in the listing for inflammatory arthritis) or whether it medically equals a listing in combination with at least one other medically determinable impairment.

---

[6] Hall also argues that "the record . . . warranted an evaluation of a Listing for RSD/CRPS medical equivalence." Doc. 13 at 11-12. Hall does not identify which listing the ALJ should have considered, nor offer any argument regarding how her impairments equaled the severity of such a listing. As such, I do not find that this argument warrants remand.

6

77 Fed. Reg. 43640, 43644 (July 25, 2012).  As part of its criteria, Listing 14.09D requires "one of the following at the marked level: (1) [l]imitation of activities of daily living[;] (2) [l]imitation in maintaining social functioning[; or] (3) [l]imitation in completing tasks in a timely manner due to deficiencies in concentration, persistence, or pace."  **20 C.F.R. pt. 404, subpt. P, app. 1 § 14.09D**.  At step three, in connection with his analysis of other listings, the ALJ found Hall suffered mild limitations in interacting with others and moderate limitations in concentrating, persisting, or maintaining pace.  AR 17-18.  The ALJ also noted when discussing Hall's RFC that "despite her impairment, she has engaged in a somewhat normal level of daily activity and interaction, which is not limited to the extent one would expect, given her complaints of severe pain and subjective limitations."  AR 19-20.  Hall does not challenge these findings, nor offer any argument regarding how her impairments medically equal the severity of Listing 14.09D.  *See Iwan v. Comm'r of Soc. Sec.*, No. 17-CV-0097-LRR, 2018 WL 4868983, at *4-5 (N.D. Iowa July 12, 2018) (holding that ALJ's failure to mention Listing 14.09D when claimant suffered from fibromyalgia was harmless error based on ALJ's discussion of claimant's activities of daily living, social-functioning limitations, and concentration and pace abilities in connection with RFC determination), *report and recommendation adopted*, 2018 WL 4295202 (Sept. 10, 2018), *appeal filed*, No. 18-3452 (8th Cir. Nov. 19, 2018); *Johnson v. Colvin*, No. 4:14CV3146, 2015 WL 5008642, at *10-11 (D. Neb. Aug. 20, 2015) (same).

Substantial evidence supports the ALJ's conclusion that Hall did not suffer from marked limitations in activities of daily living; social functioning; or concentration, persistence, or pace.  As the ALJ noted, Hall's activities of daily living included driving, "regular self-care/hygiene, preparing simple meals, weekly shopping, washing dishes, dusting, sweeping, . . . laundry (with help), driving, watching television, communicating on Facebook or the phone, visiting friends, and going out to eat at times."  AR 17, 19, 46, 224-28, 242-46, 453-54, 987-88.  Treatment notes also reflect an instance of Hall

7

babysitting (AR 1205), taking a fertility drug to increase chances of pregnancy (AR 387, 1035), exercising three times a week by walking for twenty-five minutes (AR 1236-37), and going "up and down stairs all day and [being] on her feet a lot" (AR 1213). The ALJ also noted that Hall testified she "regularly goes with her daughter to transport her grandson to and from school." AR 19, 47-48; *but see* AR 1198 (treatment note reflecting not currently exercising due to pain). Hall's activities of daily living demonstrate the ability to go out in public places and interact with people. The treatment records do not reflect that Hall ever reported difficulties interacting with people, and providers consistently noted normal objective psychological examinations (including mood, affect, judgment, insight, and thought content). *See* AR 19, 371, 376, 388, 391, 421, 442-43, 446, 533, 540, 554, 591, 643, 647, 694, 869, 923, 991, 999, 1006, 1011, 1020 1035, 1039, 1050, 1054, 1059, 1065, 1106. Although Hall testified that chronic pain interferes with her ability to concentrate (and Dr. Glascock and the CE found her markedly limited in that category), as the ALJ noted, the ability to watch movies, shop for an hour at a time, manage her finances, and other activities of daily living support that Hall suffered only moderate limitations in concentration, persistence, and maintaining pace. AR 16, 226-27; *see, e.g.*, *Hacker v. Barnhart*, 459 F.3d 934, 937-38 (8th Cir. 2006) (substantial evidence supported that claimant's ability to "follow TV shows and her son's sporting events, plan and maintain three gardens, drive a car, and fly to Denver to babysit her young nieces on a regular basis" was inconsistent "with a marked limitation of function in concentration, persistence, or pace"). I recommend finding that any error by the ALJ in failing to specifically mention Listing 14.09D was harmless.

### 2. *Listing 11.02*

Hall argues that the ALJ should have discussed whether her migraines, in combination with her other impairments, equaled the severity of Listing 11.02 (governing seizures). Listing 11.02 provides for listing-level severity based on the type of seizure,

the frequency with which they occur, and, if less frequent, a marked limitation in one of the following categories: physical functioning; understanding, remembering, or applying information; interacting with others; concentrating, persisting, or maintaining pace; or adapting or managing oneself. **20 C.F.R. pt. 404, subpt. P, app. 1 § 11.02**.[7]  This Listing went into effect on September 29, 2016.  **Revised Medical Criteria for Evaluating Neurological Disorders**, 81 Fed. Reg. 43048, 43048, 43051 & n.6 (July 1, 2016).  Prior to that time, there were two Listings for seizures:  Listing 11.02, which governed convulsive seizures "occurring more frequently than once a month in spite of 3 months of prescribed treatment"; and Listing 11.03, which governed nonconvulsive seizures "occurring more frequently than once weekly in spite of at least 3 months of prescribed treatment."  **20 C.F.R. pt. 404, subpt. P, app. 1 §§ 11.02, 11.03** (2016).

Hall relies on *Mann v. Colvin*, 100 F. Supp. 3d 710, 719 (N.D. Iowa 2015), in which the court discussed medical equivalence to the then-in-effect Listing 11.03 (which appears most similar to subpart B of the current Listing 11.02).  In *Mann*, the court noted that section DI 24505.015(B)(7)(b) of the Social Security Administration Program

---

[7]  11.02 *Epilepsy*, documented by a detailed description of a typical seizure and characterized by A, B, C, or D:

   A. Generalized tonic-clonic seizures, occurring at least once a month for at least 3 consecutive months despite adherence to prescribed treatment; or

   B. Dyscognitive seizures, occurring at least once a week for at least 3 consecutive months despite adherence to prescribed treatment; or

   C. Generalized tonic-clonic seizures, occurring at least once every 2 months for at least 4 consecutive months despite adherence to prescribed treatment; and a marked limitation in one of the following:

      1. Physical functioning; or
      2. Understanding, remembering, or applying information; or
      3. Interacting with others; or
      4. Concentrating, persisting, or maintaining pace; or
      5. Adapting or managing oneself; or

   D. Dyscognitive seizures, occurring at least once every 2 weeks for at least 3 consecutive months despite adherence to prescribed treatment; and a marked limitation in one [of the categories in C.1-C.5 above.]

**20 C.F.R. pt. 404, subpt. P, app. 1 § 11.02** (citations omitted).

9

Operations Manual (POMS) provided an example of when an impairment involving migraines would equal the severity of Listing 11.03 (governing seizures):

> A claimant has chronic migraine headaches for which she sees her treating doctor on a regular basis. Her symptoms include aura, alteration of awareness, and intense headache with throbbing and severe pain. She has nausea and photophobia and must lie down in a dark and quiet room for relief. Her headaches last anywhere from 4 to 72 hours and occur at least 2 times or more weekly. Due to all of her symptoms, she has difficulty performing her [activities of daily living]. The claimant takes medication as her doctor prescribes. The findings of the claimant's impairment are very similar to those of 11.03, Epilepsy, non-convulsive. Therefore, 11.03 is the most closely analogous listed impairment. Her findings are at least of equal medical significance as those of the most closely analogous listed impairment. Therefore, the claimant's impairment medically equals listing 11.03.

100 F. Supp. 3d at 719. This provision of the POMS no longer appears to be in effect: it is not contained in the POMS on the Social Security Administration's website. *See also David G. v. Berryhill*, No. 17-CV-3671 (HB), 2018 WL 4572981, at *5 (D. Minn. Sept. 24, 2018). Nevertheless, because it is unclear when and why this provision was eliminated from the POMS, it is not necessarily an incorrect statement of the law.

Prior to receiving treatment from a neurologist specializing in migraines, Hall reported experiencing migraines more than twice a week lasting at least four hours with accompanying symptoms of aura, nausea, throbbing pain, and light sensitivity that sometimes resulted in emergency room (ER) visits. *See, e.g.*, AR 216-17, 370, 608, 612-14. But Listing 11.02 equivalency requires experiencing these kinds of symptoms *with treatment*. In the ALJ's discussion of Hall's RFC, he addressed her migraines, noting that "she was able to control them better" with a combination of prescription medications and that after January 2015, "[t]here were very few records with regard to her headaches," indicating that with

10

treatment, she did not suffer ten debilitating migraines a month, as she testified. AR 18, 40.

Substantial evidence supports the ALJ's conclusion. As the ALJ noted, prior to January 2015, treatment records often reflect Hall's complaints related to migraines or headaches. *See* AR 608 (February 2013: reports headache free only five to ten days a month and that headaches last for four hours or longer); AR 532 (March 2013: denies headache at ER for strep/bronchitis a month after receiving a Botox injection (AR 610)); AR 539, 543, 891 (April 2013: when at ER for chest pain, initially denied suffering a headache, but later developed a frontal migraine); AR 612 (May 2013: reports headache free only six to seven days a month and that headaches last for four hours or longer; referred to headache specialist); AR 370 (June 2013: reports being "back up" to suffering fifteen migraines a month); AR 551-52 (June 2013: ER treatment for headache due to unrelated vomiting causing inability to keep headache medications down); AR 375 (July 2013: reports her headaches are better with increased dosage of medication); AR 378 (September 2013: reports medications "seem to be helping some" and that she is suffering ten headaches a month, some of which "are difficult to control even with" abortive migraine medication); AR 381 (October 2013: reports suffering "several episodes of complicated migraine"); AR 387 (December 2013: reports suffering headaches fifteen days of the month, ten of which are migraines); AR 331 (March 2014: reports suffering a headache when at ER for back pain); AR 390 (April 2014: denies suffering a migraine that day and reports that increasing dosage of headache medication helped for about a month); AR 393 (July 2014: reports was "doing good" with migraines but in the last two weeks they have increased in number and severity); AR 588 (August 2014: denies headache when at ER for throat pain); AR 216-17 (September 2014: in Social Security questionnaire, reports that with medications, suffers five to ten headaches a month); AR 420 (October 2014:

11

reports suffering two migraines per week and that migraines have been good until this week; reports this week, suffered a headache that has continued all week); AR 646 (early November 2014: reports that nasal surgery two weeks ago caused headaches and she is currently suffering ten headaches a month).

Subsequent treatment records show Hall generally experienced improvement with her headaches. At the ER in late November 2014 for a possible sinus infection after nasal surgery, she denied suffering headaches in the review of systems. AR 640. She made no mention of headaches at appointments for treatment of other issues in December and early January 2015. AR 1008-13, 1194-1206. In January 2015, at an appointment with Dr. Marc Hines, who managed her migraine treatment, she reported that although her headaches are "still a problem" and she experienced a "severe migraine" that day, overall, she "is able to control them better with" the combination of prescribed medications, and she has been having only "one [headache] every couple of weeks." AR 920. At a March 2015 appointment with Dr. Hines, she reported suffering a headache for the past week "that will not go away," but prior to that, noted she "had been doing quite well for a long time." AR 922-23. She did not mention headaches at an appointment with Dr. Glascock (her primary care provider) in April 2015 when she sought treatment for thrush. AR 1211. In a function report to the Social Security Administration filled out a few days later, she stated she had been suffering a headache for more than four straight weeks. AR 254-56. The next week, she received an injection, which provided no relief, and the day after that, she went to the ER, complaining of a migraine that started seven weeks ago. AR 1003, 1035. When she saw Dr. Hines in late April 2015, she reported suffering a migraine daily for seven weeks but that eating a gluten-free diet seemed to have lessened the amount of headaches and that she had suffered only two headaches that week (and they were not migraines). AR 1034-35. Within a week, she saw

12

Dr. Hines twice for other complaints, and she did not complain of headaches (although the review of systems does note "positive" for headaches). AR 996-1001, 1037-43. In mid-May 2015, she reported to Dr. Hines that her headaches "[are] ok." AR 1043. In late June 2015, she reported to Dr. Hines that her abortive migraine medication that she takes when she feels a migraine beginning "isn't working as well" (treatment records do not reflect how often she was having headaches, but she did not request that her preventative migraine medication be changed). AR 1047. Treatment records do not reflect doctor's visits in July and August 2015. Hall visited Dr. Hines in September 2015 and reported that her headaches "[h]ave gotten better" and that she is "not having [them] as frequently." AR 1051. She noted that she still suffered headaches "once or twice a week," but some of those headaches were controlled with abortive medication (while some were not). AR 1052. There are no treatment records for October 2015. In November 2015, she told Dr. Hines that she was suffering from nausea midday and in the evening, which was "usually not accompanied by [a headache] until this last week when she has been awakening with [a headache]" and suffering daily headaches. AR 1055-56. She did not complain of headaches at appointments with Dr. Hines or other providers from November 2015 until May 2016 (although Dr. Hines's review of systems did reflect "positive" for headaches). AR 947, 959, 1061, 1213, 1220, 1223. In May 2016, she told Dr. Glascock that "she is still having headaches, and in fact[,] her headaches seem to be worse." AR 1223. She did not seek treatment for headaches until August 2016, and she told Dr. Hines that she "had been experiencing good control of her [headaches] until this last week," that neck pain seemed to be "triggering the [headaches]," and that abortive migraine medication was "not helpful." AR 1063. Dr. Hines referred her to physical therapy for her neck pain, and treatment records reflect that she did not seek treatment for or otherwise complain about headaches at appointments with

13

Dr. Hines and other providers from September 2016 to February 2017 (although some notes do reflect positive for headaches in the review of systems, and Dr. Hines did prescribe a new abortive migraine medication in January 2017). AR 987, 990, 1021, 1023, 1066, 1070-74, 1101, 1116, 1228, 1231, 1236.

Overall, substantial evidence supports the ALJ's conclusion (in his discussion of RFC) that Hall's migraines improved with medication. Treatment records reflect that after January 2015, she went long stretches without complaining of headaches or actively reported that her headaches had improved such that they were less frequent and did not occur twice weekly (as in the POMS example of equivalency). In addition, not all of Hall's complaints of headaches reflect a complaint of a migraine (with its accompanying severe symptoms), as demonstrated by treatment notes that sometimes explicitly distinguished between the two. Any error by the ALJ in failing to explicitly consider and analyze Listing 11.02 was harmless given the ALJ's findings regarding Hall's migraines in his discussion of her RFC, which was supported by substantial evidence. *See David G.*, 2018 WL 4572981, at *6 (holding that the failure to address Listing 11.02 was harmless when "the record . . . contain[ed] evidence of headaches," but not headaches "described as intense, throbbing, or extremely painful," and no evidence established "symptoms that would equate to a typical seizure pattern, daytime loss of consciousness or convulsions, or nocturnal episodes that significantly interfered with activities"); *see also Angela M. v. Berryhill*, No. 18-CV-1258 (SER), 2019 WL 1506000, at *4-5 (D. Minn. Apr. 5, 2019) (holding that the failure to address Listing 11.02A and 11.02C was harmless error because there was no evidence claimant's migraines caused "loss of consciousness [or] violent muscle contractions" and that ALJ's RFC discussion supported finding that Listings 11.02B and 11.02D were not equaled when ALJ noted "numerous occasions where Plaintiff was not observed in acute distress, the lack of [ER] visits

14

or the use of strong medication for Plaintiff's headaches . . . , and multiple normal neurological exams"); *cf. McShane v. Berryhill*, No. CV 15-5137, 2017 WL 440269, at *3-4 (W.D. Ark. Feb. 1, 2017) (remanding for the ALJ to consider then-in-effect Listing 11.03 when the ALJ's only discussion of claimant's migraines in the RFC discussion failed to discuss treatment records indicating she complained of suffering twenty headaches a month accompanied by an aura, photophobia, and ringing in her ears); *Mann*, 100 F. Supp. 3d at 720-21 (holding that the failure to consider then-in-effect Listing 11.03 was not harmless given "sufficient evidence of chronic, severe migraine headaches during the relevant time period," including multiple visits to the ER complaining of migraines despite treatment); *Yeatman v. Colvin*, No. 4:14-CV00255-JJV, 2014 WL 7330627, at *2 (E.D. Ark. Dec. 18, 2014) (remanding for the ALJ to consider then-in-effect Listing 11.03 when the ALJ "did not really address [claimant's] migraines when formulating her RFC," despite finding them to be a severe impairment).

### B. Weight to Dr. Glascock's Treating-Source Opinion

When determining a claimant's RFC, the ALJ considers medical opinions "together with the rest of the relevant evidence." **20 C.F.R. § 404.1527(b)**. "The ALJ must give 'controlling weight' to a treating [source's] opinion if it 'is well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence.'" *Papesh v. Colvin*, 786 F.3d 1126, 1132 (8th Cir. 2015) (quoting *Wagner v. Astrue*, 499 F.3d 842, 848-49 (8th Cir. 2007)); *see also* **20 C.F.R. § 404.1527(c)(2)**. "Whether the ALJ gives the opinion of a treating [source] great or little weight, the ALJ must give good reasons for doing so." *Reece v. Colvin*, 834 F.3d 904, 909 (8th Cir. 2016). The ALJ considers the following factors to determine the weight to assign any opinion assessing a claimant's RFC:

15

(1) whether the source has examined the claimant; (2) the length, nature, and extent of the treatment relationship and the frequency of examination; (3) the extent to which the relevant evidence, "particularly medical signs and laboratory findings," supports the opinion; (4) the extent to which the opinion is consistent with the record as a whole; (5) whether the opinion is related to the source's area of specialty; and (6) other factors "which tend to support or contradict the opinion."

*Owen v. Astrue*, 551 F.3d 792, 800 (8th Cir. 2008) (quoting the current **20 C.F.R. § 404.1527(c)**).

Hall argues that the ALJ did not give good reasons for assigning "only partial weight" to the RFC opinion of her primary care provider, Dr. Glascock. AR 21. In March 2017, Dr. Glascock provided a treating-source statement, opining that Hall suffers from many disabling limitations. AR 1149-1153. Dr. Glascock found that Hall constantly experiences "pain or other symptoms severe enough to interfere with attention and concentration"; that she would need to take an unscheduled ten- to fifteen-minute break every one to two hours; and that she would miss work more than three times a month. AR 1150-51, 1153. He further opined that Hall could only walk two city blocks or stand for ten minutes before needing to rest, for a total of two hours in an eight-hour workday; that she could only sit for fifteen minutes at a time for a total of four hours in an eight-hour workday; and that she would need to shift positions at will. AR 1151. The ALJ, by contrast, found Hall could sit for longer periods of time, for a total of six hours in an eight-hour day, and imposed no shifting-positions restriction. AR 17. Dr. Glascock also found Hall's ability to use her fingers, hands, and arms was limited to less than 25% of the workday (the ALJ found Hall could use her fingers and hands up to two-thirds of an eight-hour day, did not limit the use of her left arm at all, and limited her right arm only in regards to overhead reaching). AR 17, 1152.

The ALJ found that Dr. Glascock's opined limitations were "not fully support[ed]" by the record. AR 21. As an example, the ALJ noted: "[W]hile Dr. Glascock opined the claimant could sit 4 of 8 hours and only 15 continuous minutes, the claimant reported

16

no limitations in sitting on her Function Report. Additionally, at the hearing, she testified that she could sit up to an hour at a time." AR 21. Hall argues that when considered in context, her statements in the function report and at the hearing were not inconsistent with Dr. Glascock's opined sitting limitations. In function reports completed in September 2014, although neither she nor her husband checked a box indicating she suffered limitations in sitting, she noted when asked what conditions limited her ability to work that "sitting at a desk, my feet hurt [and] swell." AR 212, 223, 228. In a function report completed in March 2015, Hall once again did not check "sitting" as being affected by her conditions, and she did not note difficulties with sitting anywhere in the function report. AR 241-48. She also reported enjoying sitting outside on her patio when the weather was warmer. AR 259. In a pain questionnaire completed around that same time, she reported that she can sit for thirty minutes at a time before her feet and legs go numb. AR 253. At the hearing in March 2017, when asked how "much of your day do you spend sitting in a chair or watching TV, or sleeping, [or] lying down?" she responded that if she is able, she sleeps for sixteen to eighteen hours a day, and "usually," she spends an hour at a time sitting before she has "to get up and move," and reiterated, "usually, when I'm sitting, it's usually about an hour at a time." AR 48. Her attorney then asked her whether she "sit[s] in [a] special chair," and she responded that she has a lounger that can recline to a 45-degree angle and elevate her legs "because [she] ha[s] to sleep . . . half sitting up," so that's "usually . . . where [she's] at." AR 48-49. The ALJ could properly find this evidence inconsistent with a limitation to sitting fifteen minutes at a time. In one function report, Hall did not report any limitations related to sitting; and in the pain questionnaire, she reported being able to sit for thirty minutes at a time. The ALJ could also find that Hall's testimony supported that she is able to sit for an hour at a time in a normal chair: although she testified regarding her use of a lounger at her attorney's prompting, she suggested that she uses the lounger to sleep in and did not testify to an inability to sit in other types of chairs. An ALJ can discount limitations

17

found by the treating source that are inconsistent with the claimant's testimony or reports of her limitations. *See Medhaug v. Astrue*, 578 F.3d 805, 815-16 (8th Cir. 2009).

Hall argues that even if her reported limitations regarding her ability to sit could be said to be inconsistent with the limitations found by Dr. Glascock, the ALJ did not provide reasons for discounting Dr. Glascock's other opined limitations. The ALJ is not required "to mechanically list and reject every possible limitation." *McCoy v. Astrue*, 648 F.3d 605, 615 (8th Cir. 2011). Moreover, as Hall recognizes, "[t]he ALJ's review of the medical records in this case[] . . . presumably informed the ALJ's evaluation of Dr. Glascock's opinion." Doc. 13 at 9. The ALJ's summary of the evidence of record, including Hall's activities of daily living, demonstrate his reasoning for finding the extreme limitations found by Dr. Glascock inconsistent with the overall record. *See Anderson v. Astrue*, 696 F.3d 790, 794 (8th Cir. 2012) (noting that an ALJ may consider whether a claimant's "daily activities belie the physical limitations contained in [a treating physician's] evaluation" when determining the weight to assign that evaluation).

As an example, the ALJ noted that during much of the relevant time period, Hall did not complain of pain or other issues with her arms, hands, or fingers. AR 19. Treatment records show that she complained of left-arm pain for about a six-month period in 2013 that seemed to resolve itself with medication. *See* AR 287, 378, 616, 780, 886 (complaints of left-arm pain in 2013); AR 334, 443, 590, 600, 1005, 1011, 1197, 1206 (treatment notes from 2014 and 2015 reflecting either normal objective examinations relating to upper extremities or denials of any joint pain). Treatment records do not reflect any complaints of wrist or finger pain throughout 2013, 2014, and most of 2015 (although a rheumatologist did note on objective examination in November 2013 that Hall had "pain/tenderness" in her fingers, wrists, elbows, and shoulder joints, but normal range of motion and no swelling; that same rheumatologist noted a normal examination in September 2014 except for crepitus in her shoulder joints). *See* AR 772, 778; *see also*

18

AR 245 (reported ability to sew and play solitaire on phone in function report in March 2015).

Hall began to complain of carpal tunnel symptoms in her left hand in November 2015. AR 1056, 1059. Her symptoms worsened in March 2016 (she reported they did not become "bad" until that time), and when a wrist splint and ibuprofen failed to offer relief, she underwent carpal tunnel release surgery on her left wrist and hand in June 2016. *See* AR 1018-20, 1060-62. At that time, a provider noted a normal objective examination as it related to Hall's right upper extremity. *See* AR 1020. By August 2016, she reported that her left hand was "doing pretty well" after surgery "except she still has some trouble grasping with the base of her palm." AR 987, 1062.

In August 2016, Hall began complaining about nerve pain radiating from her neck to her upper arms, particularly on the right side. AR 987, 1062. She began physical therapy. *Id.*; *see also* AR 988 (physical therapist finds on objective examination in August 2016 tender joints around the left shoulder and normal range of motion of the shoulders but with discomfort). A note from November 2016 reflects that when she had achieved little change in her neck and shoulder pain after ten physical therapy appointments, she did not return. AR 1100. She reported still suffering right shoulder pain in November 2016, and the provider noted that although nerve-conduction and electromyography (EMG) tests were normal, the objective findings were consistent with irritation on nerve roots in the right shoulder. AR 1069; *see also* AR 1021-22 (complaints of right shoulder pain). She was referred to a rheumatologist. AR 1069. In January 2016, she "popped" her right shoulder while shaking out a pair of pants, and an MRI revealed a torn rotator cuff that required surgery, which Hall underwent. AR 1023, 1071.

Treatment records do not reflect any complaints regarding Hall's hands (other than the carpal tunnel in her left hand that was resolved with surgery) until December 2016, when Hall was diagnosed with gout causing pain and stiffness in her right hand. AR

19

1238. She missed her appointment with the rheumatologist due to the flu, and she continued to report hand pain in January 2017. AR 1071. In February 2017, at her first appointment with the rheumatologist since September 2014, he prescribed medication to treat her hand pain. AR 1119. He noted on objective examination that her right shoulder was in an immobilizer due to surgery a few weeks prior; that her left shoulder had normal range of motion, no swelling, and no effusion; that her wrists had normal range of motion, no swelling, and no tenderness; and that her fingers had swelling and tenderness but normal range of motion except in her thumbs. AR 1118.

During most of the relevant time period, treatment records do not reflect that Hall suffered any issues with her hands and fingers. Treatment records also do not reflect complaints of left shoulder pain other than a six-month period in 2013. Substantial evidence supports the ALJ's determination that the extreme limitations in fingering, handling, and reaching found by Dr. Glascock are inconsistent with the overall record, which is an appropriate reason to discount a treating-source opinion. Overall, I recommend finding that the ALJ gave good reasons supported by substantial evidence for discounting Dr. Glascock's opinion.

### C. Conflict with the DOT

Once the ALJ determines that the claimant cannot perform her past work, the ALJ evaluates at step five whether the claimant can perform other work that "exist[s] in significant numbers in the national economy (either in the region where [the claimant] lives or in several regions in the country)." **20 C.F.R. § 404.1560(c)(1)**. The Commissioner bears the burden of proving that jobs exist in significant numbers that someone with the claimant's age, education, work experience, and RFC can perform. *See Gieseke v. Colvin*, 770 F.3d 1186, 1189 (8th Cir. 2014); **20 C.F.R. § 404.1560(c)(2)**. The Commissioner may meet this burden through testimony by a VE, but "VE testimony that conflicts with the DOT 'does not constitute substantial evidence

20

upon which the Commissioner may rely to meet the burden'" if the inconsistency is unexplained by the VE. *Moore v. Colvin*, 769 F.3d 987, 990 (8th Cir. 2014) (quoting *Kemp v. Colvin*, 743 F.3d 630, 633 (8th Cir. 2014)).

> Under [SSR] 00-4p, the ALJ must "ask about any possible conflict" between VE evidence and "information provided in the DOT." . . . If there is an "apparent unresolved conflict" between VE testimony and the DOT, the ALJ must "elicit a reasonable explanation for the conflict" and "resolve the conflict by determining if the explanation given [by the expert] provides a basis for relying on the [VE] testimony rather than on the DOT information."

*Id.* at 989-90 (second and third alterations in original) (quoting **SSR 00-4p**, 65 Fed. Reg. 75759, 75760 (Dec. 4, 2000)).

Here, the ALJ's mental RFC determination limited Hall to:

> remember[ing], understand[ing], and carry[ing] out simple, routine instructions and tasks consistent with SVP levels 1 or 2 type jobs with no strict production requirements and the emphasis being on a per shift rather than a per hour basis, for example, an employer would require so many widgets per day rather than per hour.

AR 17. The ALJ included these limitations in a hypothetical question to the VE, and the VE testified that a person so limited could work as an addresser, eyeglass frames polisher, or surveillance system monitor. AR 54-55. Hall argues that the DOT description of the surveillance system monitor position conflicts with the VE's testimony, as it requires a reasoning level of 3, but she is limited to work involving simple and routine instructions. *See* **DOT § 379.367-010**. The Commissioner responds that the ALJ's phrasing made it clear that the limitation to simple and routine instructions impacts only the SVP level, which must be a one or two, without imposing any reasoning level restrictions, and that all three of the positions identified by the VE have an SVP level of two. *See* **DOT §§ 209.587-010, 379.367-010, 713.684-038**.

The DOT defines the SVP level "as the amount of lapsed time required by a typical worker to learn the techniques, acquire the information, and develop the facility needed

21

for average performance in a specific job-worker situation." **DOT, App. C**. SVP training can be acquired through schooling, apprenticeships, classroom training provided by the employer, on-the-job training, or experience in other jobs. *Id.* Jobs with an SVP level of 1 require a "short demonstration only," while jobs with an SVP level of 2 involve more than a "short demonstration up to and including 1 month." *Id.*

The reasoning level, on the other hand, is one category of the general educational development measurement, which "embraces those aspects of education (formal and informal) which are required of the worker for satisfactory job performance" and is ordinarily "obtained in elementary school, high school, or college," but "may be obtained from experience and self-study." *Id.* Reasoning Levels one through three require a claimant to:

- LEVEL 1 - Apply commonsense understanding to carry out simple one- or two-step instructions. Deal with standardized situations with occasional or no variables in or from these situations encountered on the job.
- LEVEL 2 - Apply commonsense understanding to carry out detailed but uninvolved written or oral instructions. Deal with problems involving a few concrete variables in or from standardized situations.
- LEVEL 3 - Apply commonsense understanding to carry out instructions furnished in written, oral, or diagrammatic form. Deal with problems involving several concrete variables in or from standardized situations.

*Id.* Hall argues that by definition, jobs with a reasoning level of 3 are inconsistent with a limitation to work involving simple, routine instructions and tasks.

The parties cite to several Eighth Circuit cases to support their respective positions. In *Hulsey v. Astrue*, 622 F.3d 917, 923 (8th Cir. 2010), the claimant argued that she could "understand and carry out only simple instructions," a limitation the ALJ did not specifically include in her RFC. The parties disputed whether the ALJ's limitation to unskilled work necessarily encompassed this limitation. *Id.* at 923. The court noted "unskilled work 'needs little or no judgment to do simple duties that can be learned on

the job in a short period of time'" and "correspond[s] to [an SVP] level of one or two in the DOT." *Id.* at 922-23 (quoting **20 C.F.R. § 416.968(a)**) (citing **SSR 00-4p**, 65 Fed. Reg. at 75760). The court also noted that "[o]nly occupations with a reasoning development level of one necessarily involve only simple instructions," citing the definitions of the reasoning levels contained in Appendix C of the DOT. *Id.* at 923. Although this language could be read to support Hall's position, the court did not actually address the issue, holding that no error occurred, because "[e]ven assuming for the sake of argument that [claimant] is unable to perform some unskilled work" (because of a limitation to simple instructions), the job identified by the ALJ for the claimant had "an SVP of two and a reasoning development level of one." *Id.* at 923.

In *Clay v. Barnhart*, 417 F.3d 922, 931 (8th Cir. 2005), the claimant argued that the ability to work as a cashier, which required level three reasoning, was inconsistent with the ALJ's RFC determination that limited her to "simple, unskilled work, level three or below,' to be performed by a person with the ability to "understand, remember, [and] follow simple, concrete instructions . . . [and have only] superficial contact with the public." (alterations in original). The court noted that by adding another limitation involving simple instructions after limiting the claimant to level three reasoning, "[t]he ALJ . . . set forth further restrictions (superficial contact with public, simple concrete instructions) that are arguably inconsistent with level three functioning." *Id.* Although the court recognized the claimant's argument "may have merit," it held any error was harmless, because even excluding the cashier position, a significant number of jobs existed in the national economy that the claimant could perform. *Id.* Unlike in *Clay*, here, the ALJ specifically defined simple instructions as being "consistent with" an SVP level of 1 or 2; this case would be more akin to *Clay* if the ALJ had added another limitation involving simple instructions after discussing the SVP level.

In *Hillier v. Social Security Administration*, 486 F.3d 359, 366-67 (8th Cir. 2007), the claimant argued (in reliance on *Clay*) that working as a cashier, which required level

three reasoning, was inconsistent with her RFC limitation to "understand[ing], remember[ing], and follow[ing] simple, concrete instructions." The court recognized that "[i]n the abstract, tension exists between only being able to understand, remember, and follow simple, concrete instructions and working as a cashier." *Id.* at 367. But because the claimant had worked as a cashier twice in the past and had not suffered "any mental deterioration" since then, the court held that substantial evidence "supported a conclusion [claimant's] mental limitations did not preclude her from working as a cashier." *Id.* *Hillier* could be read to support Hall's argument that a limitation to work involving simple instructions is inconsistent with level three reasoning; but *Hillier* can be distinguished because of the ALJ's phrasing of the RFC limitation here ("remember, understand, and carry out simple, routine instructions and tasks *consistent with* SVP levels 1 or 2 type jobs" (emphasis added)).

Hall also points to *Lucy v. Chater*, 113 F.3d 905, 909 (8th Cir. 1997), in which the Eighth Circuit held that the ALJ erred by not obtaining VE testimony. The Commissioner in that case had argued VE testimony was unnecessary because the evidence established claimant "could follow simple directions, and consequently, [claimant's] impairment does not prevent him from engaging in the full range of sedentary work." *Id.* The court noted, however, that the "list of unskilled sedentary jobs . . . indicates that many jobs within this range require more than the mental capacity to follow simple instructions," since they are rated at a reasoning level of two, "requir[ing] the ability to understand and carry out detailed instructions." *Id.* at 909. Although this language supports Hall's argument, *Lucy* is ultimately distinguishable, as it hinged on the lack of VE testimony at the hearing and did not address the issue currently before the court.

The Commissioner, on the other hand, points to *Renfrow v. Astrue*, 496 F.3d 918 (8th Cir. 2007). In that case, the ALJ limited the claimant to being unable "to do complex technical work" and to sustaining "only brief and superficial" social interactions, and

24

Case 6:18-cv-02032-LTS-KEM   Document 19   Filed 08/16/19   Page 24 of 34

then asked the VE whether any "unskilled work [existed] that could accommodate those limitations." *Id.* at 920. The claimant argued that the VE's response suggesting she could work as a telephone quotation clerk or charge account clerk was inconsistent with the DOT, because those jobs required a reasoning level of three, and she could not perform complex work. *Id.* at 921. The Eighth Circuit held that the telephone quotation clerk and charge account clerk position "are both classified as unskilled and so do not appear to be 'complex.'" *Id.* The court cited *Hillier* for support, classifying that case as holding that the VE's "opinion that [a] claimant who was limited to following 'simple, concrete instructions' could work as [a] cashier was not inconsistent with [the DOT] description of cashier as requiring level three reasoning." *Id.* at 921. This characterization of *Hillier* supports the Commissioner's argument.

In *Moore v. Astrue*, 623 F.3d 599, 602-03 (8th Cir. 2010), the ALJ limited the claimant to being "able to handle simple job instructions; . . . able to adapt to infrequent work changes; and capable of performing basic mental demands of simple, routine, and repetitive work activity at the unskilled task level." The jobs identified by the VE for the claimant both required a reasoning level of two, which the claimant argued was inconsistent with his limitations to simple and routine work. *Id.* at 604. The Eighth Circuit rejected this argument. *Id.* The court reasoned "the ALJ did not limit 'simple' job instructions to '*simple one- or two-step* instructions' or otherwise indicate that [claimant] could perform only occupations at a DOT Level 1 reasoning level." *Id.* at 604 (emphasis omitted). The court further noted that level two reasoning refers to "detailed but uninvolved" instructions, and by dictionary definition, "uninvolved" means "not complicated or intricate." *Id.* at 604. The court held that there was no "direct conflict between 'carrying out simple job instructions' for 'simple, routine and repetitive work activity,' . . . and the [VE's] identification of occupations involving instructions that, while potentially detailed, are not complicated or intricate." *Id.* at 604. *Moore*

addressed an inconsistency between simple instructions and level two reasoning, not an inconsistency between simple instructions and level three reasoning, as here.

The Commissioner also relies on *Welsh v. Colvin*, 765 F.3d 926, 930 (8th Cir. 2014), in which the Eighth Circuit ultimately concluded that "[t]he failure to address any potential inconsistency between the RFC's limitation to simple, routine, repetitive work and the DOT's requirement of level three reasoning does not require a remand." But in that case, unlike here, the district court had already remanded the case back to the Social Security Administration once before because the ALJ had failed to resolve inconsistencies between the VE testimony and the DOT, and on remand, the ALJ had "thoroughly questioned the VE regarding her opinion." *Id.* at 927-28. The VE had explained that "the DOT descriptions are maximum possible job requirements" and that the hypothetical person with claimant's limitations could adequately perform the job duties identified by the VE, despite the DOT stating they required level three reasoning. *Id.* at 929-30. Here, however, the conflict between the DOT and the VE's testimony went unexplained.

The Commissioner also notes that although the ALJ limited Hall to work involving simple instructions, the ALJ did not specifically limit the claimant to work involving simple, one- to two-step instructions, as included in the definition for level one reasoning. *Cf. Thomas v. Berryhill*, 881 F.3d 672, 676-77 (8th Cir. 2018) (holding that the ability to perform "work limited to the complexity of rote '1 to 2 step tasks' . . . involv[ing] 'few variables and little judgment'" was inconsistent with VE's testimony that claimant could perform jobs with level three reasoning); *Stanton v. Comm'r, Soc. Sec. Admin.*, 899 F.3d 555, 557, 559 (8th Cir. 2018) (holding that a limitation to "understand[ing], retain[ing], and carry[ing] out simple one- to two- step instructions" was inconsistent with performing work requiring level two reasoning).

Two recent cases from the Northern District of Iowa also touch on this issue. In *Jennings v. Berryhill*, No. 17-CV-3062-LTS, 2018 WL 3656306, at \*3, \*10 (N.D. Iowa Aug. 2, 2018), the ALJ limited the claimant "to simple, routine tasks with simple

instructions," but the VE identified a document preparer job for claimant listed as having a reasoning level of three in the DOT. The claimant argued the VE's testimony was inconsistent with the DOT, and the Commissioner did not respond to that argument, instead urging the court to affirm based on the claimant's ability to work as an addresser, work the VE had also testified the claimant could perform. *Id.* at *10 & n.4. Citing *Hillier*, the court noted "tension [existed] between the ALJ's RFC assessment and the ALJ's determination that claimant could perform the work of a document preparer." *Id.* at *10. The court noted that because the claimant had no past work as a document preparer, *Hillier* was distinguishable, and that it was "unable to determine, on this record, whether claimant is capable of performing the job of document preparer." *Id.* at *10. The court ultimately concluded "that there is a possibility that claimant could perform the work of 'document preparer,' but the record is insufficient to determine whether claimant has the requisite reasoning level to perform the job." *Id.* at *12. The court recommended reversing the ALJ's decision and remanding to the Social Security Administration, *id.* at *12, and this recommendation was adopted on clear-error review, 2018 WL 4107911 (Aug. 29, 2018).

Although the court in *Jennings* suggested that a limitation to simple and routine tasks and simple instructions conflicted with a reasoning level of three, the court in *Murphy v. Berryhill*, No. 18-CV-61-LRR, 2019 WL 1140235, at *15-16 (N.D. Iowa Mar. 12, 2019), suggested the opposite. In that case, the ALJ's RFC limited the claimant to "simple, routine, and repetitive tasks," and gave substantial weight to the state agency consultants' RFC opinions, which had concluded that claimant could "perform simple, repetitive tasks consisting of 1 to 2 step commands." *Id.* at *15. The claimant argued that she could only perform jobs with a reasoning level of one, but the VE's testimony had identified jobs with a reasoning level of two or three. *Id.* at *15-16. First, the court found that any error was harmless, because a significant number of jobs existed that claimant could perform with a reasoning level of one. *Id.* at *16. But the court went on

27

to note that "the Eighth Circuit has held that a claimant who could follow "simple, concrete instructions" could do a job requiring level 3 reasoning and a claimant who was limited to unskilled work could do jobs requiring level 3 reasoning," citing *Hillier* and *Renfrow*. *Id.* at *16. The report and recommendation was adopted over the claimant's objection. 2019 WL 2372896, at *6 (Apr. 10, 2019) (holding that "[t]he ALJ's RFC assessment limited [claimant] to 'simple, routine, and repetitive tasks,'" which is "consistent with jobs requiring level 2 and level 3 reasoning," citing *Moore*, *Renfrow*, and *Hillier*), *appeal filed*, No. 19-2202 (8th Cir June 12, 2019).

Hall urges the court to follow cases from other circuits in which the courts of appeal held that "[a]n apparent conflict exists when a VE testifies that a claimant limited to simple instructions and tasks can perform Reasoning Development Level 3 jobs." *Keller v. Berryhill*, 754 F. App'x 193, 198-99 (4th Cir. 2018) (per curiam); *accord Zavalin v. Colvin*, 778 F.3d 842, 847 (9th Cir. 2015) ("[T]here is an apparent conflict between the [RFC] to perform simple, repetitive tasks, and the demands of Level 3 Reasoning."); *Hackett v. Barnhart*, 395 F.3d 1168, 1176 (10th Cir. 2005) (holding that a limitation to "simple and routine work tasks . . . . seems inconsistent with the demands of level-three reasoning" and reversing and remanding for "the ALJ to address the apparent conflict between Plaintiff's inability to perform more than simple and repetitive tasks and the level-three reasoning required by the jobs identified as appropriate for her by the VE"); *see also Joyce v. Comm'r of Soc. Sec.*, 662 F. App'x 430, 436-37 (6th Cir. 2016) ("leav[ing] open the possibility that an ALJ might reversibly err by failing to inquire about or resolve a conflict between the DOT reasoning levels and a simple-tasks limitation" but affirming as harmless error when the evidence suggested the claimant could perform the work found by the VE based on the claimant's performance of semiskilled work "during his claimed disability period"); *but see Zirnsak v. Colvin*, 777 F.3d 607, 619 (3d Cir. 2014) ("[T]here is no bright-line rule stating . . . there is a *per se* conflict between a job that requires level 3 reasoning and a finding that a claimant

28

should be limited to simple and routine work."); *Terry v. Astrue*, 580 F.3d 471, 475, 478 (7th Cir. 2009) (holding that no conflict existed between claimant's limitation to "simple, unskilled work" and ability to perform a job with a reasoning level of three, citing *Renfrow*'s characterization of *Hillier*). Ultimately, I decline to decide whether a reasoning level of three is an "apparent conflict" with an RFC limitation to simple and routine instructions and tasks. Here, I agree with the Commissioner that the ALJ's limitation to simple and routine instructions must be read in context: the ALJ limited Hall to "remember[ing], understand[ing], and carry[ing] out simple, routine instructions and tasks *consistent with* SVP levels 1 or 2 type jobs." By stating that Hall's simple-work limitation was consistent with jobs with an SVP level of one or two, the ALJ found Hall's SVP level limited, but not her reasoning level. *Cf. Clay*, 417 F.3d at 931 (suggesting that by limiting the claimant to "simple, unskilled work, level three or below," the ALJ meant to limit the claimant to level three reasoning; but by adding additional simple-work limitations after that, the ALJ meant to impose additional restrictions irrespective of the reasoning level). I do not find that an apparent conflict existed between the VE's testimony and the DOT.[8]

---

[8] I decline to address the Commissioner's argument that any error was harmless and note that whether 9,600 jobs in the national economy (without any testimony regarding the number of positions available regionally) constitutes a significant number for purposes of harmless-error review is a close issue. *Compare Vining v. Astrue*, 720 F. Supp. 2d 126, 136-37 (D. Me. 2010) (holding that 10,000 to 11,000 positions nationally was a significant number on harmless-error review) (adopting report and recommendation), *Sanchez v. Berryhill*, 336 F. Supp. 3d 174, 177-78 (W.D.N.Y. 2018) (9,046 positions nationally significant), *Hoffman v. Astrue*, No. C09-5252RJB-KLS, 2010 WL 1138340, at *15 (W.D. Wash. Feb. 8, 2010) (9,000 jobs nationally and 150 jobs in the state significant), *report and recommendation adopted*, 2010 WL 1138341 (Mar. 19, 2010), *Rikard v. Astrue*, No. 07-3029-CV-S-REL-SSA, 2008 WL 250580, at *5, *27 (W.D. Mo. Jan. 28, 2008) (suggesting that even if ALJ erred, any error was harmless because 100 positions in the state and 3,000 positions nationwide was a significant number), *with Mueller v. Berryhill*, No. 3:17-CV-78, 2018 WL 2296596, at *7 (D.N.D. Feb. 26, 2018) (expressing doubt that 700 positions in a four-state region and 11,000 positions nationally constituted a significant number), *Lora M. v. Comm'r of Soc. Sec.*, No. 2:18-CV-00198-MKD, 2019 WL 2130303, at *5 (E.D. Wash. Apr. 5, 2019) (8,500 positions nationally not significant), *report and recommendation adopted*, 2019 WL 2127306 (May 15, 2019), *Karen L. H. v. Berryhill*,

29

## D. *Appointments Clause Challenge*

The Appointments Clause of the Constitution requires that principal officers be appointed by the president with the advice and consent of the Senate and that inferior officers be appointed by "the President alone, . . . the Courts of Law, or . . . the Heads of Departments." **U.S. Const. art. II, § 2, cl. 2**; *see also Lucia*, 138 S. Ct. at 2051 & n.3. The Appointments Clause does not apply to "non-officer employees—part of the broad swath of 'lesser functionaries' in the Government's workforce." *Lucia*, 138 S. Ct. at 2051.

The Supreme Court recently held in *Lucia* that the five ALJs for the Securities and Exchange Commission (SEC) are "inferior officers" subject to the Appointments Clause, as they "exercise[] significant authority pursuant to the laws of the United States." *Id.* The Court relied on *Freytag v. Commissioner*, 501 U.S. 868 (1991), in which it held special trial judges of the United States Tax Court were inferior officers subject to the Appointments Clause, noting that both SEC ALJs and Tax Court special trial judges: (1) serve career appointments "to a position created by statute, down to its 'duties, salary, and means of appointment'"; (2) take testimony during hearings and may take pre-hearing depositions; (3) administer oaths, rule on motions, and generally regulate the court during a hearing; (4) rule on the admissibility of evidence; (5) have the power to enforce compliance with discovery, including to punish contempt by excluding people from the courtroom; and (6) issue opinions detailing factual findings and legal conclusions and ordering appropriate remedies. 138 S. Ct. at 2052-54 (quoting *Freytag*, 501 U.S. at

---

No. 3:17-cv-01750-HZ, 2019 WL 208861, at *7 (D. Or. Jan. 15, 2019) (7,400 positions nationally not significant); *see also **Johnson v. Chater***, 108 F.3d 178, 179 (8th Cir. 1997) (holding substantial evidence supported ALJ's finding that a significant number of jobs existed based on VE testimony that "200 positions in Iowa and 10,000 positions nationwide" existed for claimant and that "these figures were 'just a representative sampling of a *larger number* of jobs the claimant was capable of doing'").

30

878).  The Court ordered that the petitioner receive a new administrative hearing from a properly appointed official, noting that the petitioner "timely challeng[ed]" the validity of the appointment before the administrative agency.  *Id.* at 2055.  The petitioner had not raised the Appointments Clause challenge to the ALJ at any point during the "nine days of testimony and argument," but after the ALJ rendered an unfavorable decision, the petitioner appealed to the SEC and argued "that the administrative proceeding was invalid because [the ALJ] had not been constitutionally appointed."  *Id.* at 2050.

Hall argues that following the reasoning in *Lucia*, Social Security ALJs are inferior officers subject to the Appointments Clause, and that her case should be remanded for a new hearing before a constitutionally appointed ALJ.  Hall did not raise this issue at any point during the administrative proceedings.  Thus, the Commissioner argues that Hall has forfeited her Appointments Clause challenge.

In *Freytag*, the petitioners challenged the appointment of the special trial judge for the first time on judicial review—indeed, the petitioners had consented in the administrative proceedings to trial by a special trial judge.  501 U.S. at 871-72.  Before the Supreme Court, they argued that Appointments Clause challenges as a class cannot be forfeited or waived.  *Id.* at 893 (Scalia, J., concurring).  The majority opinion did not address this argument, instead "exercis[ing] its discretion to consider" the Appointments Clause challenge (which it classified as a "nonjurisdictional structural constitutional objection[]").  *Id.* at 878-79 (majority); *id.* at 893 (Scalia, J., concurring).  The Court noted the Appointments Clause challenge was "neither frivolous nor disingenuous" and went "to the validity of the Tax Court proceeding."  *Id.* at 879 (majority).  The Court therefore concluded this was "one of those rare cases in which [a court] should exercise [its] discretion."  *Id.*  The Eighth Circuit has interpreted *Freytag* as creating a discretionary rule in which "a reviewing court generally is permitted (though not obliged) to hear a belated appointments clause challenge."  *NLRB v. RELCO Locomotives, Inc.*, 734 F.3d 764, 795 (8th Cir. 2013); *see also Jones Bros., Inc. v. Sec. of Labor, Mine*

31

*Safety, & Health Admin.*, 898 F.3d 669, 677-78 (6th. Cir. 2018) (excusing forfeiture of Appointments Clause challenge when the plaintiff noted a circuit split on the issue before the administrative agency (Federal Mine Safety and Health Review Commission) but declined to "press" the issue); *Turner Bros., Inc. v. Conley*, 757 F. App'x 697, 699-700 (10th Cir. 2018) (holding claimant forfeited Appointments Clause challenge based on *Lucia* by failing to raise it to the agency (the Department of Labor Benefits Review Board)); *Kabani & Co., Inc. v. SEC*, 733 F. App'x 918, 919 (9th Cir. 2018) ("[P]etitioners forfeited their Appointments Clause claim by failing to raise it in their briefs or before the agency [the SEC].").

The vast majority of courts to address this issue have held that the claimant forfeited his or her *Lucia*-based Appointments Clause challenge by failing to raise it to the Social Security Administration, and the courts have declined to excuse the forfeiture. *See, e.g., Morrow v. Berryhill*, No. C 18-04641 WHA, 2019 WL 2009303, at *4 (N.D. Cal. May 7, 2019); *Kline v. Berryhill*, No. 3:18-CV-00180-FDW, 2019 WL 1782133, at *6 (W.D.N.C. Apr. 23, 2019); *Hutchins v. Berryhill*, No. 18-10182, 2019 WL 1353955, at *3 (E.D. Mich. March 26, 2019) (rejecting report and recommendation); *Diane S.P. v. Berryhill*, No. 4:17cv143, 2019 WL 1879256, at *23 (E.D. Va. Mar. 21, 2019) (adopting report and recommendation); *Valasquez ex rel. Valasquez v. Berryhill*, No. CV 17-17740, 2018 WL 6920457, at *2-3 (E.D. La. Dec. 17, 2018) (collecting cases), *report and recommendation adopted*, 2019 WL 77248 (Jan. 2, 2019); *Flack v. Comm'r of Soc. Sec.*, No. 2:18-cv-501, 2018 WL 6011147, at *4 (S.D. Ohio Nov. 16, 2018) (collecting cases), *report and recommendation adopted*, 2019 WL 1236097 (S.D. Ohio Mar. 18, 2019). A few courts, however, have found Social Security claimants do not need to raise Appointments Clause challenges to preserve the argument for judicial review or have otherwise excused the forfeiture. *See Ready v. Berryhill*, No. CV 18-04289, 2019 WL 1934874, at *2 (E.D. Pa. Apr. 30, 2019); *Culclasure v. Comm'r of Soc. Sec. Admin.*, No. 18-1543, 2019 WL 1641192, at *12 (E.D. Penn. Apr. 16, 2019);

*Bradshaw v. Berryhill*, No. 5:18-CV-00100-RN, 2019 WL 1510953, at *2-11 (E.D.N.C. Mar. 26, 2019); *Probst v. Berryhill*, No. 5:18-CV-130-JG, 2019 WL 1749135, at *8 (E.D.N.C. March 22, 2019); *Bizarre v. Berryhill*, 364 F. Supp. 3d 418, 425 (M.D. Penn. 2019); *Fortin v. Comm'r of Soc. Sec.*, No. CV 18-10187, 2019 WL 421071, at *1-4 (E.D. Mich. Feb. 1, 2019), *report and recommendation rejected in relevant part*, No. 18-10187, 2019 WL 1417161 (E.D. Mich. Mar. 29, 2019); *Muhammad v. Berryhill*, No. CV 18-172, 2018 WL 8139774, at *6 (E.D. Pa. Nov. 2, 2018) (report and recommendation), *objections filed*.

I decline to follow decisions from district courts outside the Eighth Circuit. Every district court in the Eighth Circuit to address the issue (including the Northern District of Iowa) has found a Social Security claimant's Appointments Clause challenge raised for the first time on judicial review to be forfeited. *See Kesterson v. Berryhill*, No. 18-CV-2048-LRR, 2019 WL 1938809, at *18 (N.D. Iowa May 1, 2019) (Roberts, J.) (report and recommendation); *Sexton v. Berryhill*, No. 18-CV-1024-LTS, 2019 WL 1495286, at *15 (N.D. Iowa Apr. 4, 2019) (Roberts, J.) (report and recommendation); *Hernandez v. Berryhill*, No. 8:18CV274, 2019 WL 1207012, at *6 (D. Neb. Mar. 14, 2019); *Murphy v. Berryhill*, No. 18-CV-61-LRR, 2019 WL 1140235, at *17 (N.D. Iowa Mar. 12, 2019) (Roberts, J.); *Kimberly B. v. Berryhill*, No. 17-CV-5211 (HB), 2019 WL 652418, at *15 (D. Minn. Feb. 15, 2019); *Audrey M.H. v. Berryhill*, No. 17-CV-4975 (ECW), 2019 WL 635584, at *12 (D. Minn. Feb. 14, 2019); *White v. Berryhill*, No. 18-CV-2005-LTS, 2019 WL 586757, at *15 (N.D. Iowa Feb. 13, 2019) (Roberts, J.), *report and recommendation adopted*, 2019 WL 1239852 (N.D. Iowa Mar. 18, 2019); *Catherine V. v. Berryhill*, No. CV 17-3257 (DWF/LIB), 2019 WL 568349, at *2 (D. Minn. Feb. 12, 2019*)*; *Bowman v. Berryhill*, No. 4:18-CV-157 RP-HCA, 2018 WL 7568360, at *12 (S.D. Iowa Dec. 13, 2018); *Stearns v. Berryhill*, No. 17-CV-2031-LTS, 2018 WL 4380984, at *6 (N.D. Iowa Sep. 14, 2018) (Strand, C.J.); *Davis v. Comm'r of Soc. Sec.*, No. 17-cv-80-LRR, 2018 WL 4300505, at *8-9 (N.D. Iowa Sept.

33

10, 2018) (Reade, J.); *Iwan v. Comm'r of Soc. Sec'y*, No. 17-CV-97-LRR, 2018 WL 4295202, at \*9 (N.D. Iowa Sep. 10, 2018) (Reade, J.); *Thurman v. Comm'r of Soc. Sec.*, No. 17-CV-35-LRR, 2018 WL 4300504, at \*9 (N.D. Iowa Sept. 10, 2018) (Reade, J.).[9] I adopt the reasoning of these decisions (and of the majority of courts to address the issue). Accordingly, I recommend the district judge reject Hall's Appointments Clause challenge.

## III.    CONCLUSION

I recommend that the district court **affirm** the decision of the Social Security Administration and enter judgment in favor of the Commissioner.

Objections to this Report and Recommendation must be filed within fourteen days of service in accordance with 28 U.S.C. § 636(b)(1) and Federal Rule of Civil Procedure 72(b). Objections must specify the parts of the Report and Recommendation to which objections are made, as well as the parts of the record forming the basis for the objections. **Fed. R. Civ. P. 72**. Failure to object to the Report and Recommendation waives the right to *de novo* review by the district court of any portion of the Report and Recommendation, as well as the right to appeal from the findings of fact contained therein. *See United States v. Wise*, 588 F.3d 531, 537 n.5 (8th Cir. 2009).

**ENTERED** this 16th day of August, 2019.

Kelly K.E. Mahoney
Chief United States Magistrate Judge
Northern District of Iowa

---

[9] A court in the District of Nebraska noted that Appointments Clause challenges are deemed to be "in the category of nonjurisdictional structural constitutional objections that could be considered on appeal whether or not they were ruled upon below," but ultimately, the court did not address the merits of the Appointments Clause issue, as the court was already remanding on other grounds and noted that the claimant could raise the issue on remand to the Social Security Administration. *See Mann v. Berryhill*, No. 4:18-CV-3022, 2018 WL 6421725, at \*8 (D. Neb. Dec. 6, 2018).

34